Good morning, you may be seated. This is in re the marriage of O'Bryan. Case number 4-14-0779 for the appellant. We have Richard Hopp for the appellee, Frank Byers. Counselor, are you ready to proceed? I am Richard W. Hopp, as you've already noted. I represent the appellant, Nancy O'Bryan. We are dealing with an issue of marital, non-marital property. And I find it always interesting when I read everybody's briefs, including my own, that we're all citing the same law and the same cases. And we're obviously dealing with 750 ILCS 5-503B1. It's cited in everybody's brief, and it presumes that property acquired during the marriage is marital. There is a presumption. Everybody cites the Didlier case, and I don't know if I pronounced that correctly. And in that, the presumption may, it says, and I've cited it on page 21 of my brief, that presumption may only be overcome with clear and convincing evidence. I've also got a fourth district court that says unmistakable evidence. Now, when we go beyond that, we're here on appeal, of course, and everybody agrees that the standard on appeal is contrary to the manifest weight of the evidence. Realistically, what this case gets down to is what was the evidence. And Mr. Byers, on behalf of his client, has cited the Henke case on page 6 of his brief, which says that oral evidence is sufficient to sustain the burden. I have cited a number of other cases, including Didlier again. We have a number of bank accounts. We have a number of investment accounts. We have other things in this case. And in that case, I want to look particularly at the provision in there about tracing. And it provides that, in the Didlier case, that tracing is necessary. And they talk about accounts. This is on page 25 of my brief. It says here, in order to meet her burden of proof, and I'm quoting from Didlier, and that's on page 817 to 818 in the northeast second provision, Gail was required to trace asserted nonmerital source of funds in the accounts by clearing, convincing, and affirmative evidence. And it goes on to say, while the balance statement provided the trial court with a recent balance for each of the accounts, they failed to satisfy the tracing requirement. Now, in this case, we had recent statements, one or two that were produced by Mr. Byers. As I've stated in my brief, that's not sufficient to trace the origin of the funds. And so I don't believe the clear and convincing test has been met. During the course of this marriage, Mr. Hoppe, where were the parties' paychecks deposited? Well, that's interesting. There's a Soy Capital Bank account, and I brought in the signature card of it, and that dates back about 15 years before the divorce itself. The signature card on that account said that it was created for a direct deposit for Mr. O'Brien's income. And Mr. O'Brien, on the witness stand, denied that, but admitted that he was a salesman, by the way, and he put in reimbursement of his business expenses into that account. So the evidence was that account was being used for, if you look at the signature card that he created, a direct deposit of his WECE earnings at that point, I believe, and by his admission, he put in money that reimbursed business expenses. I think that's certainly marital income. The Hickory Point Bank account, there was a checking account there, and money was deposited into the Hickory Point Bank account. This was where Mr. O'Brien's wages went. My client's wages went into her own account, which we acknowledge was marital. There was also, in the statement of position by Mr. Byers on behalf of his client, he acknowledged, stipulated, that the Hickory Point Bank account was a marital account. Mr. O'Brien... Is that the same thing as the PNC? No. The Hickory Point Bank is a different account. There were two accounts at PNC, your honor, and one was a money market account, the other was a checking account. And Mr. O'Brien maintained those, and he said that the PNC money market account, I believe, was his farm account. And if we look in the checking account, I have that, if you want to look at it, on page 27 of my brief, and there were only two statements brought in from the PNC money market. There was also, on page 26 to 22nd, I talk about the checking account at PNC. With numerous deposits in that account, one of the things we say that this has not been shown to be orally, by clear and convincing evidence, non-marital property, is that Mr. O'Brien could not identify deposits. I cite several of them. There are a lot of financial records in this case. I tried not to overwhelm my brief with them. But I cite a deposit, December 20th, 2010, of $3205.54. There were deposits of $1755 and $10,330 between April 17th, 12th and May 15th, 12th, which he believed were commission checks from his employment, which is marital money. And the big one that I always like is there's a deposit of $141,459.42 on June 25th, 2013. Now, I don't know about you folks, but that's a lot of money for me. And this was within about a year before this case was tried. And Mr. O'Brien could not recall the origin of those funds. I mean, $141,000 you put in your account about 12 months before and you don't know where it came from? I would remember that. And I don't think that that creates oral testimony that's clear and convincing. And likewise, we have the joint federal and state tax refunds for 2011 and 2012 being deposited in that account. He has transfers from the Hickory Point Bank going into that account, all of which, in my opinion, creates a commingled account. And so even if he did put some non-marital money in there, that is total commingling and I believe that that becomes marital money. The money market account, he said... Counsel, it seems like the trial court must have believed him. And therefore, we're looking at a credibility assessment, which this court gives great deference to the trial court on that issue. Your Honor, I cannot disagree with you. And I always wonder about our statutes when we say contrary to the manifest weight and nobody could reach a contrary decision and I'm up here and I'm saying, gee, one judge already did and decided this case against me. And it does, I think, in part, smack of a credibility issue. All of the appellate court decisions, I have not cited this in my brief, but everything I've ever read, was that we give great deference and once the judge determines credibility, we're not going to overrule that on appeal. Please note, in the judgment, there is no finding on credibility. So you do not have a direct finding on credibility here. We're not saying, I believe Guy or I believe Nancy on this issue or that issue. The trial judge, in the final order, made no finding on that. Well, wherever that leads you. He may not have made a finding, but the end result would indicate that he made some findings in his own mind. Clearly, which is why I always appreciated if trial judges would set out exactly what they're thinking so we wouldn't be up here in front of you folks saying, well, it kind of looks this way. So, I'm not sure why he made the decision he did. I'm just saying when I have co-mingling going into these accounts and I have appellate court decisions that say it's got to be by clear and convincing evidence and you're supposed to trace this. And I have, for example, then in the other PNC account, we have testimony that when I had certificates of deposits come due, I would deposit the money in the account, wait for other investments, and then transfer it out. There's no evidence of certificates of deposit. There's no identification of the money going in. There's no identification of the money going out. And so I'm looking at it, I'm thinking perhaps the trial judge missed the standards. How much money was in the Hickory Point bank account that was awarded to your plan? Somewhere around $20,000. There was an investment account that was awarded to her as well. I think that was about $140,000. Other than that, that's basically all she received. She was awarded attorney's fees of $4,000. I've set out the judgment in this, but that's where we're at on it. So I think it gets down to looking at the evidence. Everybody here agrees, I believe, what the law is, what the standards are. It's a question of were these met in the trial court. My position clearly is they were not. And I've set that out on commingling and the testimony. I would point to one other thing that I think you ought to look at. The trial judge, for example, gave a Wayman James account to Mr. O'Brien. On page 30 of my brief, I reference that. His testimony was that he invested money that he believed was inherited. That's not the type of an affirmative statement where you say, gee, I should give that great credibility. I believe this to be the case, but that leads me to the other side of that. I'm not sure, but I believe that's where it came from. Now, I know that Mr. Byers, in his brief, has said, well, a lot of these documents aren't available because the banks only keep them seven years. Frankly, since I tried this case, there was no evidence that the banks only kept these records seven years. Likewise, there were probate records available and other documents that could have been brought in. Likewise, what happened to the account statements for the last seven years if this money was coming in and out? And if we don't have that, do we ignore the requirement of tracing the funds? Likewise, I want to point out one other thing. Mr. O'Brien testified that he created this trust in order to keep property separate from Hanson. It's a vehicle. I put it in my trust. Therefore, this is my non-murder property, and I'm going to keep it. Well, his testimony, if you get down to some of the personal property, the vehicles, the boats, and the like, he did testify that at least one or two of these items was in the name of the trust. The only thing that's in the name of the trust in any of the vehicles he has, he had two Chevrolet vehicles, he had an old truck, he had a boat, and he had a jet ski. The only thing in the name of the trust is the jet ski and the jet ski trailer. Everything else he put in the name of Guy O'Brien individually. So if we take what he's saying as true there, how is this then non-murder property? If he created this vehicle to keep it separate but didn't, presumption there, at least as I would view his testimony, if I put it in my name, it's murder property. Was there a total amount of money, evidence of the total amount of money he inherited? It seemed to me there was $40,000 from the grandmother, $50,000 from the grandfather, and then his father was another, what, 60%? Yes, there is, and it is, I think, set out in Mr. Byers' brief, actually, where he summarizes the amounts of money and the dates that that was received. And I can sign that for you. It's in his brief at some point that he received money and the origins of it. Likewise, when we look at one of the accounts, he testified at one point that he transferred money from a trust account but then had referenced another bank and there was no testimony at all about what was in the other bank account. Was there a summary document? I didn't have a chance to look at the record in this case, and I will do that after the argument, but I mean, is there a document that summarizes the assets? The judge's order doesn't give any amounts or values or anything. No, it does not. But did you introduce an exhibit that summarized that? Well, in our statement of position, which we filed with the court, all of the values of the assets are summarized. There are current account statements attached to the statement of position. I've done that. We have for the values of the vehicles. There were NADA printouts attached. That would be the same for the boat. We agree that his house was non-marital property. He purchased that before the marriage. We still, notwithstanding that, we didn't have it appraised, but we agreed that that was the value and stipulated that that's his property. About the only thing for which there is not an appraisal is the household goods and furniture. Obviously, that costs more to get it done than generally what the household goods and furniture were. So you have all of that spelled out in the statement of position, and there really was not any dispute by the parties as to the values of the accounts. What specific relief are you requesting from this court? Specifically, I'm asking the court to overturn the decision because the burden of proof was not met in declaring these items of property, other than the house, non-marital property, and to remand it with directions that it is marital property and to be appropriately divided under Section 503. So you're saying your specific request is that we remand it to the trial court with instructions that the trial court find that all of the accounts and all the property were marital except for the house? Correct. Okay. And that because there's been no division under the provisions of 503, I believe that it's up to the trial judge then to make an equitable division of the assets. What about the farmland? I thought he bought farmland with the grandparents' inheritance money. Okay. He said that he bought that with grandparents' inheritance. One of the inheritance referred to he received several years before he purchased the farmland, another one about the time that he purchased the farmland. There was no tracing of the accounts or money going into it. There were no probate records shown that these were correct. They were round figures, $50,000, $40,000. And he placed it into the name of the trust. The only evidence we have is we have deed, a title policy showing it was held in the name of the trust. So there was no evidence introduced at trial showing what accounts the money came out of to pay for the land? Correct. And there was not even any probate records. And the provider said, well, the records aren't available. It's too old. But there weren't even any probate records brought in. I mean, they would show how much he inherited and when. Likewise, I know that he referred to the- But you mentioned earlier that opposing counsel's brief spelled out what the inheritance was from the grandparents and from his father. Are you refuting those assertions? I'm just saying that you asked whether the information at trial was summarized, and I believe it was, in Mr. Byer's brief. I did not go back at the time of the trial and research what all of these probate cases would show. I'm not sure I even knew where the cases or the estates would have been probated or whether there was even a small estates provision or anything of that nature. But I did not do that. Mr. Byer summarized in his brief, I believe, what the testimony was and what his client said that he inherited from each of his relatives. Well, it seems to me that the trial court heard his testimony. There was no evidence to contradict that testimony, and that's why the trial court found that the farmland was non-murial property. Your position is there had to be something more than just the testimony. Correct. And please understand that the testimony was that he did not include her in any of his financial decisions. She did not have any knowledge of it, how title was held, or anything else. It was done kind of secretive. So it's rather impossible for us to go back and orally contradict that. Nor did he bring in any other person or persons, real estate agent, anybody else, to testify and collaborate what he was saying. Did you issue a subpoena for all the documents of these transactions? I issued subpoenas for records from the banks and on the accounts, and a lot of that is in a couple of volumes that were misplaced here, and Mr. Byers fortunately scanned them in. There's big, big volumes with financial records in them, and as I said, I've tried to summarize in my brief without being overwhelming on that information, but a lot of information was subpoenaed by me, including within the record. So the answer is yes. Okay. Any other questions? I think my time is virtually up. Thank you, Mr. Hoppe. You'll have a chance on rebuttal. Mr. Byers? Thank you, ma'am. Please support Mr. Hoppe. Your Honor, the practicality of this is that the trial judge heard all of the evidence. One of the things that has kind of been overlooked maybe in the arguments that have been advanced so far is that these parties, this is not a first marriage for Mr. O'Brien. This was his third marriage, and at this point in time, Mr. O'Brien was well aware, I'm sure, back in 1984 when he got married to keep his non-marital property separate from his marital property through experience of two prior divorces. And so he established a trust to put in his non-marital property as it was acquired over the years. One of the things that has kind of been overlooked in the evidence is that these parties were financially separate from day one. She earned money. She worked. She had her own bank accounts, as Mr. Hoppe just related to the court in his argument. And he had his own bank accounts where they deposited their marital money. We suggest that's a marital account. And then he also had the other accounts that were the O'Brien trust accounts, which is where all the non-marital money was deposited over the years. And if you look at one of the other things, you've got to remember, my client never graduated from high school. He was earning at the time of his divorce from, this is our Exhibit 8, he was earning $1,100 a month as an income. He had two kids from his prior marriage that he was paying child support on. He did not have the financial wherewithal to accumulate money to buy farm ground or anything else just a few years later. If you look at the practicality of the situation, the only way my client ever accumulates any kind of assets like this is through inheritance. What was the value of the total assets, including non-marital, given to your client following the divorce? I do not, because I don't believe we ever had an appraisal of the farm ground. My client's farm ground, I don't believe that was ever appraised. So I don't think there's ever been a total amount of the assets that went to my client. In the exhibits, we have summarized all the accounts, and therefore I don't know that I've ever put a dollar sign to all of them, but all of the individual accounts are put forth in the exhibits. I cannot answer that question to the court at this moment. I guess the point, the total inheritance he had was somewhere in the neighborhood of $150,000, right? At different times, he also inherited condominium in Florida from his father. See, first he inherited from his grandmother, and then his grandfather. Wasn't that about $90,000? Yes, and then he inherited from his mother, and I want to say that's $67,000. And then he inherited from his father, in addition to the cash that he inherited, he and his brother inherited a condominium in Florida. His brother came and testified to this, by the way. So there's more than just my client's testimony. And then eventually, and they set up a separate account to run the Florida condominium, him and his brother, and then eventually they sold the Florida condominium. But every time that he dealt with this, and all the income from the farm went into the trust checking account. Which is where? At different times, it was rolled from one bank to another as banks bought themselves out. At one point in time, it was in Citizens Community Bank. At one point in time, it was at PNC. Before that, I believe it was in Millican Bank. The testimony is there, that from time to time he would roll them forward into different banks. Different banks got bought out. Okay, but at the end, when the judge is looking at it, which account? The PNC accounts. The 1705 and the 8577 were both considered his trust accounts? Yes, and they were in the trust name, Your Honor. And in fact, there was actually several different accounts. Those two accounts, there was one for some other monies that he had inherited and rolled forward, and one was just the farm monies. So that, but this was all uncontroverted at trial. There was never any evidence that was contrary to what we asserted, because the facts of the case are that this is the way the parties operated. He was totally separate from her. But we all know, sitting here, that that doesn't matter, because his earnings during the marriage and his acquisition of property during the marriage is presumed to be marital property, right? Earnings, yes. And property he acquires, unless he can trace that there's a presumption that arises, right? And the presumption operates against your client, and the burden is on him to show by clear and convincing evidence that the property is non-marital. All of that is true. All of that is true. And as we set forth in our brief, that non-marital property, unless there is an intent to make a gift to the marriage, remains its non-marital status. Well, what is the clear and convincing evidence that you produced to rebut the presumption? Well, certainly the trial judge believed that our evidence was clear and convincing. Well, I'm asking you, what is the evidence? Tell me what the evidence is. It's the oral testimony that's uncontroverted that he inherited these monies, and this is what he did with them. That when a CD would come due, he would roll it into the next CD, and it may not be at the same bank if another bank offered higher interest rates. That the origin of these monies, all of these monies, either were from his prior divorce set forth in the affidavit that he had gone vile with his prior divorce, or the inheritance that he received. And his earnings were never enough to accumulate these kind of assets, as reflected in his financial affidavit. The only way he can accumulate these things, as a practical matter, is through inheritance, and his testimony was that that's where he got the money. That's the original source of the money, and that he rolled it forward from time to time from one account to another. Okay, did he introduce any documents or bank records to trace back where the money came from? That's what I'm asking. What is the evidence other than his testimony? Other than his testimony, there is no evidence, Your Honor. And the reason being, we're going back to 1984. This is, there's just not records back to 1984. Unless a person plans on getting divorced, when you get married, you're not going to keep things from 1984 in 2011. Was there evidence of the cost of the farm? Yes, yes there is. The cost of the farm, we had the title policy that was admitted into evidence that reflected the cost, and I believe it was $86,000. It might have been $84,000, but I think it was $86,000. And there's no mortgage on it, never has been a mortgage on it. He paid $86,000 out of the $90,000 that he had inherited from his grandmother and his grandfather. That was his testimony. There's no way that he could accumulate that kind of money, earning $1,100 a month. Doesn't he make that $68,000? At the end. But back in the time that we're talking about, he's earning $1,100 a month. And he's paying child support out of that to two other kids from the prior marriage. There's no way he can practically accumulate this $86,000 to pay cash for farm ground unless he inherits the money. Were there loans on the 2013 vehicles? No, there was no loans. So he paid cash for that? He paid cash. His farm income was, the way these parties operated, as is in the testimony, is each operated, they lived off of their earnings. Everything that the farmer earned, everything that his non-marital monies earned, rolled forward in the non-marital accounts. And so he had the ability in the non-marital accounts to buy something for cash. How many acres did he have? 33. I mean, that's not going to produce a large amount of income. No, but if it's not spent over the years, it accumulates to a large amount of money. But you've got to have some tax. You've got real estate taxes, right? Sure, sure. And he's not farming it. He's renting it out. I'm not sure if it was cash rent or crop rent, but he gets the landlord's share of the rent. And out of that he would pay the landlord's share of whatever. Most farms I've seen have losses, not gains. Not positive income. I mean, we see a lot of farm divorces. They're not in the plus side. They're in the negative side. But anyway. Well, from 1980, whatever, what year? I forget now. 1988 to, or 98 to present, he's accumulated money through that. And his condo in Florida accumulated money. That was like $40,000, right? I'm sorry? When he sold it, his share was around $43,000. Right. But while they operated it, they rented it. And the income from that came off too. The condo was one that he and his brother rented out to people who wanted to go to Florida for the winter and things like that. And there was income from that too that went into... Right, but I mean, they've got expenses associated with that condo. True. You would have HOA fees. You would have property taxes. You've got repairs and maintenance. All true. All true. It's not like it's just cash cow building up. I'm sure he would like to have been, but I'm sure there are those expenses, Your Honor. All of this is uncontroverted, though, as to what the style and manner in which they lived. They lived on their income. These people have never had a large lifestyle. They lived on their income that they earned in their earnings. Everything that we're talking about is something that has come from things that were not their earnings. What about Mr. Hopps' claim that your client testified that the Raymond James account he believed was inherited from his father, or he put the money in there from an inheritance. He believed that. Is that clear and convincing evidence? Well, Your Honor, if you take one line out of all the testimony and say, is this clear and convincing, I understand that that can be an issue. But if you look at the overall picture of all the evidence that was presented... Just this answer. I understand. But what his testimony was was that he rolled things forward from one account to another, and he couldn't remember which account it came out of. That's not saying he didn't know the original source. What the original source was either his farm income, his condo income, or his inheritance that he received directly, or the money that he had prior to the marriage that was as reflected in our Exhibit 8, the Connecticut Mutual, which was eventually bought out by Mass Mutual, and that's all in there. And that's uncontroverted, too. So my guy didn't start out with nothing. He started out with a house that was fully paid for from his prior marriages. He started out with assets that had no lien on them. They were investment monies from his prior marriage. So he didn't start out with nothing. And all of that is rolled forward. And when he testifies, I don't know which account it comes out of, doesn't mean he isn't saying it's non-marital or that it was marital money. He's saying because I've rolled these accounts forward since 1983, I can't tell you which one it was rolled forward out of over time. What about the $141,000 deposit one year prior to the divorce? Well, I understand that there is that money. What's the evidence that shows where that money came from? He couldn't recall where that came from. He couldn't recall the specific account that that was rolled out of, yes. He had different CDs that came due at different times. And that's exactly true. He did testify to that. But the source he did testify was his non-marital money that came out of his inheritance or his farm ground or his condo earnings. He also couldn't tell you which one of the CDs was cashed in. Then there was no way he could have presented some documentary evidence to show that he had cashed this CD or that CD and that's how the $141,000. That could have been done, Your Honor. That could have been done. That particular CD could have been, but that wouldn't have showed the original source of that CD. The original source of all of this is old. We could have showed that particular CD being cashed in, but then the question would have been, okay, well where did you get that original source? It all goes back to the beginning. Nevertheless, the law, the way we're looking at it, the way we're faced with it today, our statute says and the case law says, there's a presumption. The presumption is against your client. Your client has the burden, and it's not by a preponderance of the evidence. It's by clear, convincing, unmistakable evidence. That's a high standard. Yes, and I believe that the trial court properly determined that. Well, the trial court didn't tell us anything except the bottom line. I mean, I can't even, from looking at Judge Correal's order, I can't even tell the total amount that was given to each party. Well, Judge, I believe that the case law also says that oral testimony can be sufficient for tracing. That unless there is a positive showing of intent to make a gift to the marriage, that if it starts out non-marital, it stays non-marital. And I cited that case on page 14. I'm just saying, if you clearly and convincingly showed property was non-marital, that's correct. I have no problem with that. That's true. What Judge Correal could have done that would have been helpful to us was to say, you know, I've heard the evidence in this case, and I find that the funds that were from the PNC account and the money market and checking account at PNC came from the inheritance that Mr. O'Brien got from his grandparents. That money was deposited there and used to purchase that farm ground. Therefore, the farm ground is non-marital. And you go through each asset, and you show what the basis for your decision was. Looking at his order, I can't tell what he was thinking. Well, Judge, the problem, like the farm ground was bought in 1998, we got what we could. We got the original deed. We got the title policy. We got what we could. The financial records from 1998 and the year 2011 are not available. I mean, they're just not available from that far back. The banks don't keep them now. Did you put in evidence to that effect? Is there anything in the record that says that? I'm not sure that's correct. And I noticed you said that in your brief, but I'm not sure there's any evidence in the record to that effect. Well, I don't know if it's in the record or not, Your Honor. I don't remember that specifically. Did you call a witness from the bank to testify? No, we did not call a witness from the bank. I do know that when we were preparing for trial, I sent my client out to try to gather things, and we got what we could get. That I do know. I can't tell you that it was reported back to me that these are as much records as we can get. So we went back to try to do what was just so old that we couldn't get. And I appreciate that that may not be technically in the record, and I apologize for saying it to the court if it's not in the record. But we tried to go back and get things from 25 years ago, and 25 years ago is just too hard to get stuff. 1998's not that far. Well... 17. 17 years ago. I mean, some of these records go all the way back because we had the prior divorce. We went back to the prior divorce to get the records we could out of it. And some of these things... Your Honor, Mr. Hopp keeps talking about probate cases. Well, some of these things were payable on death certificates, a deposit that he got from his grandparents. They wouldn't even have been a probate estate. But we couldn't find those. We tried. We honestly tried to go back and find things that we knew would be helpful, but we just couldn't do it. So we have what we have. We think it's enough. And the decision is, is that enough to overcome the presumption? And the fact that you might not be able to get the records or trace it, that's not our fault. Or our concern, even. The burden still stays with you. And that's why I think oral testimony has been found to be sufficient. That's why I think that courts such as this has recognized that there are things sometimes you just can't go back and get. Didier doesn't really say that. Didier says it's not sufficient. Didier says you need documents, you need receipts, you need cancel checks. Well, I also cited in re-marriage Hunter and Henke. And Henke, Didier relies on Henke in making the statement they made. And I also cited in re-marriage Preston. But, Your Honor, I see my time's about up, unless there's a specific question. Just to that, I just want to read to you from Didier, where it says, We determine only that under the circumstances before us, the bare assertion of a non-marital source of a particular sum of money, without supporting documentary evidence such as account records, deposit slips, cancel checks, et cetera, cannot be deemed clear and convincing. And they cite Henke. Right after that quote, they cite Henke. I understand. And Henke says that oral tracing is sufficient. Under certain circumstances, it may be. Mm-hmm. All right. Thank you, Mr. Byers. I don't see any other questions. Thank you. Mr. Hoppe, any rebuttal? I just want to, in the interim period of time, sit here and find some of the things that you have been asking about. Please note as well, and I wanted to point this out, the trust was created by Mr. O'Brien back in the 90s, but the accounts, and I have the signature cards, and that is in evidence, were not transferred into the name of the trust until 2005 through 2009. They also transferred a lot of the mutual funds into the hidden name of this trust in that same period of time. This was not done simultaneous with the creation of the trust. The PNC checking account for which there were, to the money market on page 13 of my statement of facts, shows a balance of $251,349.97 on December 18th, 2012. Can you do that again? Page 13 of my brief in the statement of facts, the balance of the PNC account as of November 16th, was $251,349.97. I do cite then the $31,668 in money was transferred to the money market account, which he claims is his farm account. And I'm saying to you that is a commingled checking account. He transferred money from the Hickory Point Bank, joint income tax returns. He had the deposit of $141,000. He doesn't know where it came from. But anyhow, you can read that. That's kind of a rebuttal. With the guy's inherited money, I apologize, it's in my brief. It's page 19 to 20. He said he received from his grandmother way back in 83, 43,000, grandfather in 86, 50,000. And then I have to go back and reference when this farm was purchased and where that money was in all that period of time. His father died in 98. He got $67,390. And then the condo was sold in 2010, which doesn't factor into much of any of these things because they were all acquired before that, $43,107. And from his mother on page 20, $2,970 on a small estate affidavit. Likewise, if you will reference what they did bring in, the financial affidavit from Mr. O'Brien from his previous divorce. These parties were married about 29 years, by the way. And he shows then that he said that he had the Panorama Plus variable annuity with MassMutual. He said it was a derivative of a Connecticut Mutual insurance policy that he had prior to his marriage. But his financial affidavit, which is in the record, shows that this was a debt because he was paying for it, not an asset, and there was no valuation put for it. And that's different than the MassMutual profit check. Right. So that's what they're saying. This is where it came from, but it's shown as a debt, not an asset. I believe that, and if you go look at the docket entry where Judge Correale made his decision, he references how unfortunate it is that he's declaring all this to be non-marital property. I believe the split was somewhere around $500,000 to $600,000 that was awarded to Mr. O'Brien. But I'd have to go, like Mr. Bridesmaid, I'd have to go back and look that up. So if any of what I've said is helpful, I hope so. Thank you. Okay, thank you. We'll take this matter under advisement. Stand in recess.